**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| BRYAN OTERO as next friend of his minor child WYATT OTERO,<br><br>Plaintiff,<br><br>v.<br><br>AMTRUST FINANCIAL GROUP, d/b/a WESCO INSURANCE COMPANY,<br><br>Defendants. | No. _____ |

**COMPLAINT FOR DECLARATORY JUDGMENT, BREACH OF CONTRACT, BAD FAITH, BREACH OF FIDUCIARY DUTY, AND VIOLATIONS OF THE TRADE PRACTICES AND FRAUD ACT AND UNFAIR PRACTICES ACT**

Plaintiff Wyatt Otero, by and through Bryan Otero, as father and next friend, through his attorneys, Freedman Boyd Hollander Goldberg Urias & Ward, P.A. (Joseph Goldberg, David Urias, and Vincent Ward), hereby submits this Complaint for Declaratory Judgment, Breach of Contract, Bad Faith, Breach of Fiduciary Duty and Violations of the Trade Practices and Fraud Act, and Unfair Practices Act, and in support thereof, states the following:

PARTIES AND JURISDICTION

1. Plaintiff Wyatt Otero is a minor. He is represented by his "next friend," Bryan Otero who is also his father. Wyatt Otero resides with his parents, Bryan Otero and Erica Asmus-Otero (collectively the "Oteros"), in Sandoval County, New Mexico.

2. Defendant Wesco Insurance Company ("Wesco"), is a corporation with its principal place of business in Delaware.

1

3.       Defendant Wesco engages in the business of insurance and was registered with the New Mexico Department of Insurance until September 1991 when it re-domesticated to the State of Delaware.  In June of 2006, the stock of the company was sold to AmTrust Financial Group.

4.       Jurisdiction and venue are proper pursuant to 28 U.S.C. § 1332 as there is diversity among the parties and the amount in controversy exceeds the sum of $75,000.

## FACTUAL ALLEGATIONS

5.       On November 8, 2003, the Oteros and Fuller Homes, Inc. (hereinafter "Fuller") entered into a purchase agreement for the construction of a new 1,750 square foot, three-bedroom home located in the Paradise Ridge subdivision on Albuquerque's Westside.  The home's address is 9915 Geneva Dr. NW, Albuquerque, New Mexico, 87114.

6.       The Oteros agreed to pay $157,990.00 for the new home, which included a premium charge for the lot.  They put down $3,000.00 to begin construction.

7.        Fuller estimated that it would take six months to complete construction, so the closing was set for April 2004.

8.       By April 2004, Fuller had completed most stages of construction, including framing and roofing and the installation of plumbing, electrical and mechanical systems, drywall and sheetrock, and interior fixtures, including cabinetry in the master bedroom and kitchen.  All that remained to be done was the exterior and interior finishing work, including installation of skylights.

9.       On or about April 2, 2004, forecasters predicted heavy rainstorms in the Albuquerque metro area. This worried the Oteros because on a previous visit to the construction site they discovered that Fuller had failed to close the home's windows.  The Oteros also noticed that

Fuller left skylight openings uncovered.  The Oteros were concerned that if it rained, as forecasted, rainwater might enter the home through the openings and damage the home.

10.     Before the rainstorm the Oteros notified Fuller that the forecast called for heavy rains and that the home's windows and skylights were open.  Fuller assured the Oteros they would secure the home by closing the windows and covering the skylights.

11.     Even if the Oteros had not warned Fuller and been assured by Fuller that Fuller would secure the home against rain, it was Fuller's responsibility to ensure that the home was watertight so that rainwater could not enter the inside of the home.

12.     On April 2, 2004, heavy rains fell.  Fuller failed to close the windows and cover the skylights, which caused rainwater to enter the home.

13.     That evening, during the heavy rainstorm, the Oteros visited the construction site to check on the house.  To their dismay they found that Fuller had left the windows and skylights open, which allowed a substantial amount of water to pour into the home.

14.     As evidenced by pictures and video taken at the time, the rainwater saturated the interior walls and floors of the home.  The rainwater penetrated and soaked the gypsum board/drywall particularly in the bedroom Wyatt Otero would later occupy – and damaged some of the fixtures, including cabinets that were located in the master bathroom.

15.     Rainwater also pooled outside the foundation of the home against the East and South facing exterior walls – including outside of Wyatt's room – due to faulty excavation and grading causing poor drainage around the home, which Fuller knew or should have known, and which Fuller should have immediately remedied to avoid water damage and the growth of harmful toxins inside the interior walls.  It took several days for the water to recede.

16. The moisture in the gypsum board created conditions conducive to the growth of mold in the exterior wall structures of the home, and, in particular, in Wyatt's room.

17. Shortly thereafter, the Oteros met with their sales consultant from Fuller, and the construction foreman to discuss how best to resolve the water damage inside and outside the home. The Oteros expressed their concerns about water damage to the home. At the meeting Fuller promised to replace the wet and saturated gypsum board throughout the home and the wet and saturated cabinets in the master bathroom.

18. Fuller further represented to the Oteros that the South and East exterior walls of the home suffered no damage from the pooled rainwater and required no repairs.

19. The Oteros relied on these representations and remained a party to the purchase agreement, subject to Fuller's agreement to repair the water damage. On or about April 8, 2004, the Oteros prepared and sent a letter to the Fuller's President, Tammy Fuller, evidencing this supplemental repair agreement.

20. Shortly after entering into this supplemental repair agreement, Plaintiffs marked the underside of a cabinet drawer in the master bathroom with a red "X" to ensure that Fuller replaced the cabinet as promised.

21. At some point thereafter, the Oteros inspected the home to determine whether Fuller made the promised repairs. During the inspection, while Fuller was present, the Oteros opened the marked cabinet drawer and found that it had not been replaced, revealing to the Oteros that Fuller had failed to make the promised repairs.

22. To keep the Oteros from terminating the purchase agreement, Fuller represented that the failure to replace the cabinet was an oversight and that the wet and saturated drywall had been

replaced. Fuller again promised to make all necessary repairs to damage caused by the rainwater.

23. The Oteros relied on Fuller's representations that they would make all necessary repairs if the Oteros agreed to remain in the purchase agreement. Fuller's representations caused the Oteros to move forward with the purchase of the home, and they closed the transaction on April 22, 2004.

24. On July 28, 2008, slightly more than four years after moving into the home, Wyatt was born. From a very early age Wyatt suffered from unusually severe, frequent upper respiratory infections and illnesses, including pneumonia, which required hospitalization, treatment and supplemental oxygen. To this day, Wyatt still suffers from upper respiratory ailments.

25. Wyatt has been diagnosed with chronic asthma.

26. Wyatt's poor health makes it difficult for him to do many things children his age do, like travel, laugh, run and play, without coughing and wheezing, and receiving frequent nebulizer and corticosteroid treatments.

27. In the fall of 2010, the Oteros noticed a musty odor in parts of the house, including in their bathroom and in Wyatt's room. As described below, the Oteros ultimately learned that, contrary to Fuller's representations, Fuller had not repaired the water damage to the home, which allowed dangerous mold and toxins to grow and collect inside the structure of the home.

28. After conducting some research, the Oteros hired Assaigai Analytical Laboratories, Inc., to test for the source of the musty odor. Assaigai and its associated company Immunolytics (together "Assaigai") discovered high concentrations of toxic pathogens, fungi, and mycotoxins, including Altermaria, Aspergillus/Penicillium, Chaetomium, Cladosporium, and Stachybotrys (most commonly referred to as "Black Mold.")

5

29. The Oteros also hired Assaigai to analyze the levels of pathogens, fungi, and mycotoxins found in the home. The Assaigai report concludes that,

> The total airborne fungal spore concentration levels for the samples collected from the son's room and master bedroom, when compared to the outside background sample level, were moderately elevated to the outside ambient background levels with the levels being higher in the son's bedroom. These levels, while moderately elevated at the time of inspection, would not be expected to affect humans who have a normal functioning immune system but could affect those individuals who have a genetically pre-disposed sensitivity or susceptibility to mold exposure.

> The wall-check sample collected from the south wall of the son's bedroom below the window sill detected significant Aspergillus/Pencillium and Stachybotrys mold contamination. The detected spores observed in the wall-check sample were healthy and robust indicating active growth. It is suspected that the source of the elevated airborne Aspergillus/Penicillium spores in the air sample collected in the son's bedroom is the mold contamination detected in the wall-space. It is reasonable to expect that airborne levels of spores could significantly increase at times as a result of positive air pressure differentials within the wall(s) relative to the interior of the residence causing airborne mold contamination (spores) to diffuse into the living space of the residence. This would explain the intermittent detection of musty and moldy odors within different areas of the residence.

30. Additional tests by Assaigai in December of 2010, showed elevated levels of Aspergillus/Penicillium in the master bedroom of the home.

31. On or about February 23, 2011, Plaintiffs retained CERL, Inc. ("CERL"), to conduct more testing of the musty odor. CERL's analysis confirmed the findings of Assaigai.

32. As part of their due diligence, the Oteros tested for leaks inside the walls and found none.

33. In March 2011, pursuant to the recommendation and remediation plan developed by CERL, the Oteros retained Mountain Shadows Environmental ("MSE"), a remediation company, to remove the toxic biological materials inside the home. MSE remediated Wyatt's room, the master bathroom, and master bedroom along with either discarding or cleaning furniture, clothing, toys and personal belongings that had resided in those rooms.

34. On April 1, 2011, CERL confirmed that MSE successfully remediated the home.

35.   During this timeframe, the Oteros were instructed by their physician to leave the home and that Wyatt could not return even after the home was remediated.

36.   In July of 2011, the Oteros sold the home at below market value.

37.   The toxic pathogens, fungi, and mycotoxins formed and harmed Wyatt due to Defendant's failure to: (1) cover the skylights and close the windows of the home during the April 2004 rainstorm, (2) grade the property to prevent the pooling of water against the exterior walls of the home, (3) repair the water damage by removing all wet and saturated building materials, including drywall and insulation, and replacing it with new, dry construction materials, and (4) drain the pooled water from the exterior of the home immediately after the rainstorm.

38.   The toxic pathogens, fungi and mycotoxins caused or contributed to Wyatt's development of severe upper respiratory infections and illnesses, including pneumonia, and asthma. Wyatt is also allergic to Penicillin and other antibiotics that are Penicillin derivatives and is required to take Flovent, a steroid which comes with side effects including stunted growth with long term use and lowered immune response, among others.

## Wesco Insurance

39.   Defendant Wesco issued Commercial General Liability policy number WPP1015724 00 (the "Policy"), with effective dates 7/19/10-7/19/11, to Fuller.  The policy provides liability limits of $1,000,000 per occurrence, and $2,000,000 in aggregate coverage, subject to a $10,000 deductible.

40.   On May 17, 2012, the Otero's, through counsel, made written demand (the "Demand") of Fuller to compensate the Otero's in excess of $1 million due to Fuller's failures in constructing the Home which led to the formation of biological toxins including black mold. The Demand

included information that the claim was for the failure to prevent and remediate water intrusion. A copy of the Demand is attached as Exhibit A.

41. Upon receipt of the Otero's complaint, Fuller timely tendered the Demand to Defendant Wesco.

42. Upon information and belief, Defendant Wesco directed Network Adjusters, Inc, a third-party claims administrator authorized to respond on Defendant Wesco's behalf, to review Fuller's claim.

43. Upon information and belief, NAI assigned Susan Vicente as the responsible claims adjuster.

44. Via letter from Susan Vicente dated August 20, 2012, Defendant Wesco through NAI, denied providing coverage for the Demand and specifically stated that Defendant Wesco has no duty to defend or indemnify Fuller for the loss. Susan Vicente, on behalf of NAI stated the denial was due to endorsement CG 501010 (09/09) FUNGUS, MILDEW AND MOLD EXCLUSION which allegedly excludes coverage for arising out of, resulting from, caused by, contributed to, or in any way related to the existence, inhalation or exposure to any "fungus/fungi" and or "spore(s)."

45. On August 11, 2014, the Oteros filed suit against Fuller for alleged damages arising from Fuller's failures in preventing rainwater from entering the Home and failing to make repairs as a result of rainwater entering the Home that led to the development of mold during and after construction of the Home (the "Lawsuit").

46. In that Lawsuit, the Oteros sought damages in excess of One Million Dollars ($1,000,000) stemming from Fuller's alleged failures, the development of mold and the harm caused to Wyatt Otero as described above.

47.     The Lawsuit was strongly litigated by both Fuller and the Oteros, including the utilization of both medical and construction experts.

48.     The Otero's construction expert found:

a. It is customary for builders in New Mexico to provide temporary moisture protection for their work, and Fuller had an obligation to protect the completed interior finishes of the Home during the entire construction period.

b. It is customary for builders in New Mexico to repair work damaged as a result of their own actions or inaction.

c. Fuller should have removed any/all wet drywall, insulation and cabinets, dehumidified the wall cavities and then replaced all with new materials, and finally restored the assembly to its pre-rain event appearance.

d. It is common knowledge in the construction industry in New Mexico that wet paper facing on insulation and drywall are surfaces where mold has occasion to grow and that wet particle board cores of cabinet boxes, doors and drawers are also fertile for mold growth.

e. Builders in New Mexico know, and Fuller knew that the consequences for failing to provide necessary temporary moisture protection for interior walls and finishes, inadequately removing the drying wetted finishes, and incompletely replacing removed finishes and cabinets was likely to lead to extensive and costly repairs and the potential for mold.

f.      Fuller failed to properly and adequately provide temporary moisture protection to the Otero's Home during construction.

g.      Fuller failed to close windows and seal skylight openings at the Otero Home the day of the rain event.

9

       h.       It is probably that the wetting event was the cause and promoted mold growth in Wyatt Otero's bedroom, and otherwise.

       i.       Because work on the Otero Home was not yet complete and access was unfettered, it would have been relatively easy and inexpensive for Fuller to have removed wetted drywall and cabinets and de-humidify wall cavities immediately after the rain event.

       j.       It is indisputable that Fuller failed to replace the wetted cabinets as promised.

       k.       Fuller should have removed all wetted drywall and insulation from affected walls and de-humidified the wall cavities where drywall was removed after the rain event. Considering that mold was later found in walls in the area of the event, it is reasonable to assume that Fuller did not adequately remove wetted drywall and other finishes as promised.

49.       After extensive litigation, including intensive discovery and motion practice, the Oteros and Fuller Homes entered into, on or about April 6, 2017, a confidential Settlement Agreement of Release of all Claims, inclusive of a Confidential Casualty Loss Agreement and Covenant not to Execute (together the "Settlement") of all claims for relief and damages that the Oteros, made or could have made in the Lawsuit arising from or attributable to Fuller's failures in constructing the Home.  The Settlement was approved by order of the Second Judicial District Court of the State of New Mexico on April 25, 2017.

50.       Pursuant to the Court approved Settlement, the Parties agreed to a total casualty loss associated with the Oteros claims of Two Hundred Twenty Thousand Dollars ($220,000).

51.       In partial satisfaction of the casualty loss, Fuller agreed to, and did, pay the Oteros, Seventy Thousand Dollars ($70,000) with the agreement that the Oteros would seek to satisfy the uncollected amount from Fuller's insurers pursuant to an assignment of Fuller's contractual and extra-contractual claims against any of its insurers.

52. In the Settlement, Fuller stipulated to certain facts regarding allegations made in the Lawsuit, including:

    a. Prior to taking occupancy of the Home a rainstorm occurred that caused water to penetrate the inside of the Home and pool mound the Home's exterior.

    b. Fuller Homes repaired the water damage by replacing some fixtures and scraping wet paint off some of the interior walls and repainting.

    c. In approximately 2010 the Oteros discovered biological toxins growing inside some of the interior walls of the Home.

    d. From an early age Wyatt Otero suffered from severe upper respiratory infections and symptoms associated with asthma.

    e. Wyatt lived in the Home from his birth in July 2008 until the Oteros vacated the Home in 2011.

53. In the Settlement, Fuller pledged that it timely sought coverage from its various insurers and that such coverage was denied, including failing to provide a defense to the claims outlined in the Lawsuit.

54. In the Settlement, Fuller promised that, as a result of the extensive litigation that was conducted, including intensive discovery and motion practice, Fuller incurred in excess of $100,000 (one hundred thousand dollars and zero cents) in attorney's fees and costs to defend itself against the claims in the Lawsuit.

55. In the Settlement, Fuller agreed to cooperate with the Oteros in pursuing the unpaid casualty loss of One Hundred Fifty Thousand Dollars ($150,000) and reimbursement of Fuller's attorney fees for defending the Lawsuit amounting to more than One Hundred Thousand Dollars ($100,000).

11

56.     After the court approved the Settlement, the Lawsuit was dismissed without prejudice on July 14, 2017.

## COUNT I – DECLARATORY JUDGMENT

57.     The Oteros restate and incorporate by reference each and every allegation appearing above, as though set forth fully herein.

58.     An actual controversy exists between the Oteros and Defendant concerning Defendant Wesco's duty to indemnify Fuller for the Casualty Loss approved by the court and Wesco's duty to defend Fuller from the Demand and subsequent Lawsuit.

59.     Pursuant to the New Mexico Declaratory Judgment Act, NMSA 1978 § 44-6-1 et seq., the Oteros are entitled to a declaratory judgment against Defendant Wesco, declaring the rights, obligations, legal status, and relationship of the parties to the Policy including, but not limited to:

    a.     A declaration that the exclusions and policy provisions relied upon by Defendant to deny coverage for the Demand and subsequent Lawsuit are ambiguous;

    b.     A declaration that the exclusions and policy provisions relied upon by the Defendant to deny coverage for the Demand and subsequent Lawsuit are void as against public policy as they are illusory coverage;

60.     A declaration that the exclusions and policy provisions relied upon by the Defendant to deny coverage for the Demand and subsequent Lawsuit are repugnant;

61.     A declaration that Defendant Wesco owes a duty to defend and indemnify Fuller for the Demand and subsequent Lawsuit and the Casualty loss approved by the court.

62.     Entry of the requested declaratory judgment will terminate the controversy and uncertainty giving rise to this action.

## COUNT II – BREACH OF CONTRACT

63.     Oteros restates and incorporate by reference each and every allegation appearing above, as though set forth fully herein.

64.     Insurance coverage is construed in light of the reasonable expectations of the insured, both the expectations arising from the policy language and from the dynamics and course of dealing of the insurance transactions.

65.     Insureds are entitled to rely upon the representations of agents, adjusters, and intermediaries in insurance transactions, as if they were representations of the insurer.

66.     Fuller was entitled to rely upon its reasonable reading of the Policy, including its reasonable interpretation of ambiguous policy provisions that the Policy would include coverage for the claims raised in the Demand and subsequent Lawsuit.

67.     Since Fuller was entitled to rely upon and/or assume that insurance coverage was in place, Defendant's refusal to timely, thoroughly investigate, evaluate, defend or pay the Casualty Loss constitutes a breach of the insurance contract set forth in the Policy.

68.     Under the provisions of the Policy, Fuller's insurance coverage represented therein, and Fuller's reasonable expectations, Defendant Wesco breached its contractual duties by failing and refusing to provide proper insurance protection and coverage, to timely and/or thoroughly investigate, evaluate, defend, settle, or pay the Casualty Loss approved by the court.

69.     As a result of Defendant's breaches, Fuller incurred damages, including consequential damages, attorneys' fees, costs, interest, and other damages, and which were assigned to the Oteros.

70.     Defendant should have reasonably foreseen or anticipated that, as a consequence of its failure or refusal to perform under the Policy, Fuller would suffer monetary hardship, and extra contractual damages.

71.     Defendant Wesco breached the insurance contract with a dishonest judgment, culpable mental state and/or in bad faith disregard for Fuller's rights.

72.     As a result of Defendant Wesco's dishonest judgment, culpable mental state and/or bad faith, the Oteros, on behalf of Fuller, is entitled to recover punitive damages in an amount to be proven at trial.

## COUNT III – INSURANCE BAD FAITH AND BREACH OF FIDUCIARY DUTY

73.     Oteros restate and incorporate by reference each and every allegation appearing above, as though set forth fully herein.

74.     Fuller was protected under the Policy and Fuller's reasonable expectations which require that Defendant Wesco exercise its fiduciary duties of good faith and fair dealing in its claims handling practices.

75.     Fuller notified and contacted Defendant Wesco for insurance protection when the Oteros made Demand of Fuller, and Defendant Wesco, in bad faith, failed and refused to adequately evaluate coverage.

76.     Additionally, Defendant Wesco failed or refused to defend Fuller, and failed to timely and/or thoroughly investigate, evaluate, settle, or pay the claim and Casualty Loss approved by the court.

77.     Defendant Wesco acted unreasonably in failing to defend Fuller and pay the claim stemming from the Demand and Lawsuit, including the Casualty Loss approved by the court.

78.     Furthermore, Defendant Wesco failed to give the interests if its policyholder, Fuller, the same consideration as Defendant Wesco's interests.

79.     As a direct and proximate result of Defendant's bad faith actions and breaches by Defendant Wesco of its fiduciary duties in its claims handling practices described herein, Fuller suffered damages in an amount equal to the Casualty Loss and Fuller's attorney's fees.

80.     The conduct engaged-in by Defendant, as described herein, was undertaken in a willful, wanton, and reckless manner, justifying a significant award of punitive damages.

81.     By unreasonably failing to pay the claim stemming from the Demand and Lawsuit, including the Casualty Loss approved by the court, Defendant Wesco is required to pay attorneys' fees and costs in accordance with NMSA 1978 § 39-2-1 (1977).

### COUNT IV – VIOLATIONS OF THE TRADE PRACTICES & FRAUD ACT

82.     Oteros restate and incorporate by reference each and every allegation appearing above, as though set forth fully herein.

83.     Defendant is an "insurer" for purposes of the Trade Practices and Fraud Act of the New Mexico Insurance Code, NMSA 1978 § 59A-16-1 et seq.

84.     By engaging in the acts described above, Defendant has violated the Trade Practices and Fraud Act by engaging in unfair and deceptive claims practices as prohibited by § 59A-16-20 including, but not limited to:

    a.     Misrepresenting to Fuller pertinent facts or policy provisions relating to coverages at issue;

    b.     Failing to adopt and implement reasonable standards for the thorough investigation and processing of insureds' claims under the policies;

    c.     Failing to provide Fuller a reasonable explanation of the basis relied on in the policy in relation to the facts or applicable law for denial of a claim.

85.     As a direct and proximate result of Defendant Wesco's violations of the Trade Practices and Fraud Act, Fuller has incurred, actual damages, attorneys' fees, and costs.

86.     The conduct engaged in by Defendant Wesco as alleged herein, was engaged in willfully, justifying an award of attorneys' fees and costs.

### COUNT V – VIOLATIONS OF THE UNFAIR PRACTICES ACT

87.     Oteros restate and incorporate by reference each and every allegation appearing above, as though set forth fully herein.

88.     In connection with the sale of the Policy to Fuller, Defendant Wesco had a duty to not make false or misleading representations of fact, including omission of material information, to Fuller.

89.     Defendant Wesco's failure and refusal to provide the insurance coverage sold to Fuller and its failure or refusal to thoroughly investigate, evaluate, defend, settle, or pay pursuant to the Policy that was misrepresented, provided, and sold to Fuller, violates the New Mexico Unfair Practice Act, NMSA 1978 § 57-12-1 et seq.

90.     Additionally, Defendant Wesco's failure to inform Fuller that it would exclude coverage for any claim that resulted in the growth of mold was an omission of material fact amounting to a false or misleading statement in connection with the sale of the Policy, further violating the New Mexico Unfair Practices Act.

91.     Fuller relied upon Defendant Wesco's false and misleading statements and omissions of material facts in connection with the sale of the Policy, to its detriment, causing actual damages in an amount to be proven at trial.

92.     Defendant Wesco willfully engaged in its violations of the Unfair Practices Act, as alleged herein, justifying an award of treble damages.

WHEREFORE, the Oteros pray for a Judgment against Defendant, as follows:

a.      For a declaratory judgment as set forth in Count I;

b.      For an award of compensatory, consequential, actual, and special damages in amount at least equal to the Casualty Loss and Fuller's attorney's fees against Defendant Wesco;

c.      For an award of statutory damages against Defendant Wesco under the Trade Practices and Fraud Act in an amount to be proven at trial;

d.      For an award of statutory damages and treble damages against Defendant Wesco for violations of the Unfair Practices Act;

e.      For an award of punitive damages against Defendant Wesco;

f.      For an award of attorneys' fees and costs against Defendant Wesco pursuant to NMSA 1978 § 39-2-1;

g.      For an award of attorneys' fees and costs against Defendant Wesco as provided-for under the Trade Practices and Fraud Act;

h.      For an award of attorneys' fees and costs against Defendant Wesco under the Unfair Practices Act;

i.      For an award of pre- and post-judgment interest; and,

j.      For such other and further relief available under the law.

WHEREFORE, Plaintiff requests judgment against Defendant for the following:

Damages to be determined at trial but no less than $320,000; and

Such other and further relief as the Court deems just and proper.

## Demand for Jury Relief

Plaintiffs demand a trial pursuant to F. R. Civ. 38(a).

Respectfully submitted,

/s/ *Vincent J. Ward*

Vincent J. Ward
**FREEDMAN BOYD HOLLANDER
GOLDBERG URIAS & WARD, P.A.**
20 First Plaza NW, Suite 700
Albuquerque, NM 87102
T: 505-842-9960
F: 505-842-0761
vjw@fbdlaw.com